[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action to terminate parental rights concerns Evan G., a minor child whose date of birth is September 16, 1984. Joan L., the child's maternal aunt and court-appointed legal guardian, signed a termination of parental rights petition on March 15, 1995 which was filed with the Probate Court for the District of East Lyme, Connecticut on March 20, 1995.
The matter was subsequently transferred (pursuant to C.G.S. § 45a-715 (g) and Connecticut Probate Court Practice Book Rule 7.2) to the Superior Court for Juvenile Matters in Montville. It was thereafter referred to this venue for trial.
The original TPR petition, brought under the applicable subsections of C.G.S. § 45a-717, sought to terminate the parental rights of Marilyn G. and Kenneth G., Evan's biological mother and father. (The parents were never married to each other and have different last names.) The petitioner subsequently withdrew the petition against the father, and proceeded only against the respondent mother. Joan L. is the sister of Marilyn G. CT Page 7491
PROCEDURAL HISTORY
Two statutory grounds for termination were alleged against the mother in the petition: abandonment, (per C.G.S. § 45a-717
(f)(1)), and lack of an ongoing parent-child relationship, (per C.G.S. § 45a-717 (f)(3)). The petition was subsequently amended, pursuant to a February 27, 1996 request to amend petition filed by petitioner.[1] The amendment added additional factual allegations, but the two underlying statutory grounds alleged for termination remained as originally plead.
Trial in this case commenced on September 16, 1996, and continued on September 17, 18; and 20, when the matter concluded. (The parties requested and received time after the conclusion of trial to submit memoranda of fact and law.) Both the petitioner and the respondent were present and represented by their respective counsel throughout the proceeding. The minor child was also represented by court-appointed counsel during the trial.
The petitioner introduced the testimony of three witnesses at trial:
1. Joan L., Evan G.'s aunt and legal guardian;
2. Kim Hurlock, school bus driver;
3. Dr. Willie Coleman, the child's psychologist.
Marilyn G. testified on her own behalf and also called the following witnesses:
1. Patricia Silva, DCF social worker
2. Ward John McFarland M.D., respondent's physician.
Counsel for the minor child presented documentary evidence and participated fully in the cross examination of witnesses, but did not introduce the direct testimony of any witnesses.
FACTUAL FINDINGS
The court, having carefully considered all of the evidence and testimony adduced at trial, makes the following findings of fact: CT Page 7492
The petitioner first received temporary custody of Evan in August 1986, when Marilyn G. was hospitalized at Elmcrest Psychiatric Institute for substance abuse treatment. The Elmcrest discharge summary concerning that hospitalization indicated that mother began using heroin in 1985 after her "doctor dropped her from 400 mg a day of Demerol to nothing." (Petitioner's Exhibit 6-A, Page 1). The summary also indicated that mother's use of heroin "progressed to the point where she stayed out of work for two months and was residing in her car with her boyfriend and her two year old son." (Petitioner's Exhibit 6-A, Page 1). Joan L. cared for Evan for approximately one year before the respondent resumed caring for him in 1987.
In November 1988, Evan was again placed with his aunt when Marilyn G. was hospitalized for psychiatric treatment. This time the child remained with the petitioner until April of 1991. Evan was returned to his mother's care in April, 1991 after Marilyn G. complained that the child had been abused by another member of Joan L.'s family. This allegation was subsequently determined to be unfounded. Approximately four months later, in August 1991, Evan returned to live with his aunt when Marilyn G. was again hospitalized at Elmcrest. At the time of this admission, Joan L. received an order of temporary custody from the East Lyme Probate Court. That court subsequently removed the mother as the child's legal guardian and appointed Joan L. to serve in that capacity. (Petitioner's Exhibit 6). Now 12 years old, Evan has resided continuously with Joan L. and her family since August, 1991.
Marilyn G. has suffered for a number of years with substance abuse and psychiatric problems that have required rather extensive periods of hospitalization and out-patient treatment.[2] Marilyn G. receives supplemental social security income payments due to psychiatric disability. The respondent claimed at trial that her psychiatric difficulties resulted from a post traumatic stress condition attributable to molestation she experienced as a child. (Testimony of respondent). She indicated that this PTSD condition was only diagnosed two years ago. The 1986 Elmcrest summary indicated a discharge diagnosis of "Opioid dependence, continuous." (Petitioner's Exhibit 6-A, Page 4). An Elmcrest psychiatric evaluation prepared in October 1992 listed diagnoses of "Major Depression", "Generalized Anxiety Disorder," "Personality Disorder," and "Seizure Disorder." (Respondent's Exhibit B, Page 2). A discharge summary from the Savannas Hospital in Port St. Lucie, Florida, where the respondent was a patient from October 16, 1993 until November 16, 1993, listed the CT Page 7493 following discharge diagnoses:
"Axis I: 1. Major depressive episode
2. Mixed substance abuse, in remission.
3. PTSD.
Axis II: Mixed personality disorder.
Axis III: Chronic pain syndrome."
(Respondent's Exhibit E, Page 2).
Until 1991, the relationship between Joan L. and Marilyn G. was positive, and the aunt supported her sister's efforts at reunification. The petitioner frequently drove the child to visits with the respondent, and also provided the respondent with financial assistance. After April 1991, the relationship between the sisters became strained. This undoubtedly resulted from the unfounded allegation of abuse which Marilyn G. made against her sister's relative.
During the periods in 1991 when the child was in Joan L.'s care Marilyn G. visited and telephoned Evan frequently. A January 6, 1992 report to the East Lyme Probate Court by psychologist Dr. Willie Coleman notes that "this boy feels torn between loyalty for his mother and loyalty for [the petitioner's family]. In spite of this it is clear that Evan is happy with [the petitioner's family] and has adjusted well to his life in East Lyme." (Petitioner's Exhibit 13, Page 3). Dr. Coleman also wrote then that "I have found [Evan] to feel strongly and positively connected to both his mother and his aunt." (Petitioner's Exhibit 13, Page 3).
The mother and child visited frequently in 1992, although Joan L. claimed that around this time Evan began to display a more distant attitude about his mother. In April 1993, the already strained relationship between Marilyn G. and Joan L. became further exacerbated. The petitioner alleged that she caught Marilyn G. stealing money from the pocketbook of their elderly mother. As a result of this, Joan L. stopped paying the respondent the $100 per month which she had previously provided to assist with her sister's support and maintenance. Joan L. testified that around this time, the mother's contacts with Evan CT Page 7494 became more sporadic. In April 1993, Marilyn G. filed a motion at the East Lyme Probate Court to vacate the aunt's guardianship. (Petitioner's Exhibit 8). The parties resolved this matter by a stipulation which was drawn up with the assistance of Dr. Coleman and filed with the probate court on August 12, 1993. (Petitioner's Exhibit 12). In accordance with this agreement, Evan was to remain under Joan L.'s guardianship while the mother undertook various steps to demonstrate that she had rehabilitated to the point where she could again care for the child. If she was successful in these reunification efforts, it was anticipated that Evan would be returned to her custody. The target date for this custody shift was the 1993-94 academic year. Joan L. testified that she went along with this reunification plan "reluctantly". She believed that Dr. Coleman's requirements were "not stringent enough" and that Marilyn G. could not care for Evan. The stipulation required, inter alia, that mother would provide a list of all her prescribed medications and their dosages to Dr. Coleman, participate in various types of therapy, and undergo biweekly random drug screen tests. The results of these tests were to be supplied to Dr. Coleman. The agreement also provided for unlimited phone contact, and allowed the mother bi-weekly visits with Evan, one at her place of residence, and one that the home of Joan L. (Petitioner's Exhibit 12).
This was the second stipulated agreement between the parties concerning Evan's guardianship which was entered at the East Lyme Probate Court. That court had entered earlier stipulated orders concerning the mother's visitation and disclosure of her medical records on January 8, 1992, when it originally removed Marilyn G. as Evan's legal guardian. (Petitioner's Exhibit 6).
There was conflicting testimony at trial concerning the respondent's compliance with the expectations entered on August 12, 1993. Dr. Coleman testified that he never received the list of medications and dosages, and that the mother was generally non-compliant with respect to the random drug testing. He also expressed his belief that the respondent had been inconsistent in receiving psychological treatment. Mother testified that she complied with the drug testing initially, but thereafter experienced financial problems paying for the tests. She also testified that she believed Dr. Coleman had received the list of prescribed drugs from one of her physicians.
The mother's testimony at trial was frequently rambling and disjointed, and at times evasive, or lacking in credibility. For CT Page 7495 example, the respondent claimed that she had not suffered any substance abuse "relapses" since 1986. Her physician, Dr. McFarland, testified that his records indicated that one drug screen administered to the mother during 1992 was found to be positive for cocaine.
The court does not accept the respondent's testimony about her compliance with the August 1993 stipulations as being credible. Evidence at trial reveals that prior to the August 1993 stipulated expectations, the mother had been able to obtain approximately six earlier drug screening tests. The court finds that had the respondent sincerely wished to do so, she could have secured assistance in obtaining the drug screening. Furthermore, it was well within the respondent's capabilities to ensure that documentation concerning her medications — which had been requested due to allegations that the mother abused prescribed drugs — was transmitted to Dr. Coleman. In short, the court finds that the respondent failed to cooperate with the requirements which could have resulted in her reunification with Evan during the 1993-1994 academic year.
As a result of mother's non-compliance with the August 1993 Probate Court agreement, Evan was not returned to his mother's custody. During October 1993, the respondent was admitted for treatment at a mental health facility known as the Savannas Hospital in Port St. Lucie, Florida. She was a patient there from October 19-November 16, 1993 (Respondent's Exhibit E). She thereafter returned to Connecticut.
During 1994, the mother's visits and contacts with Evan were not consistent, although there was evidence that this was due, at least in part, to a series of hospitalizations, automobile accidents, and other occurrences which transpired during that year. There was also evidence that around this time, the respondent did not have a car, and was largely dependent on the petitioner to transport the child from Old Lyme to Hamden for visits. There were two visits between Evan and the respondent during January, 1994, but no contact during the month of February. (Petitioner's summary of fact, page 8) It was around this time that the respondent was hospitalized at St. Raphael's Hospital in New Haven. The mother had presented herself for treatment of a leg injury. She testified that the hospital originally admitted her for psychiatric evaluation but subsequently discovered that she had, in fact, sustained a fractured limb. CT Page 7496
Joan L. brought Evan to visit his mother at St. Raphael's when she was hospitalized there in March 1994. In April 1994, the respondent's mother passed away and Evan was left in his mother's care for part of the day when Joan L. went to make funeral arrangements. The mother was also with the child during the grandmother's wake and funeral, although Joan L. testified that there was little interaction between mother and child them. No visits took place during May, June or July, and Joan L. was unsure of her sister's whereabouts during the latter two months. She subsequently discovered that Marilyn G. had been admitted for psychiatric treatment at Yale-New Haven Hospital during the summer of 1994 for what was alleged to have been a drug overdose. The mother testified that she was in fact hospitalized at Yale, but claimed that she had not taken an overdose. She alleged that she had been purposely over-medicated by her then-boyfriend, Peter, who had attempted to kill her. The respondent did not offer any medical records or police reports to corroborate this allegation. Her physician, Dr. McFarland, testified that around the time of this hospitalization the respondent was taking prescribed Klonapin (a tranquilizer), Doxepin (an anti-depressant), and Depakote (an anti-seizure medication). Dr. McFarland is not on the staff at Yale New-Haven, and did not treat the respondent there during this admission. He testified that mother did not subsequently tell him about her claim that Peter had intentionally administered an overdose of medications. Dr. McFarland claimed to be aware, however, that the respondent told him around this time that she was having trouble with Peter.
The respondent testified that following her discharge from Yale-New Haven Hospital, she became involved in an outpatient program at Elmcrest, and also spent time at a battered woman's shelter in Middletown because she was afraid of Peter, who had been stalking her. Joan L. testified that the mother and child had another visit in August 1994. The respondent was scheduled to host a birthday party for Evan in September, 1994, but this visit was canceled after mother claimed that she was not feeling well.
The respondent returned to Florida during the late summer or early fall of 1994, due to what she claimed were medical and personal safety concerns. She claimed at trial that one of the reasons she left the state was her fear of harm from Peter. The respondent was readmitted to Savannas Hospital in October 1994. After her release from that facility she remained in Florida, where she made the acquaintance of a man named Jim. The CT Page 7497 respondent alleged that she continued to fear Peter, and that this concern for her physical safety prompted her to remain out of state[3]. She claimed that she remained in contact with Evan during late 1994 and early 1995 through telephone calls and cards.
Marilyn G. testified on direct examination that in February 1995, Joan L. stopped accepting her telephone calls to Evan. The petitioner admitted this during her testimony, although she indicated that she did so because she believed the respondent's calls upset the child. Patricia Silva, a DCF social worker, noted in a TPR study which she prepared for the probate court that: "Maternal aunt stated that after February, she stopped accepting mother's calls. The calls were upsetting the child. Also, maternal aunt felt that any efforts to help mother were futile." (Petitioner's Exhibit 14-E, Page 7). As noted above, Joan L. signed the TPR petition on March 15, 1995, and it was thereafter filed with the East Lyme Probate Court on March 20, 1995.
Sometime during March 1995, the mother returned to Connecticut from Florida in the company of her friend, Jim. On the afternoon of March 22, 1995, the mother attempted to make contact with Evan when he got off his school bus at a stop near Joan L.'s home in East Lyme. The perceptions of petitioner and respondent concerning this incident vary significantly. Joan L. believed that Marilyn G. was trying to abscond with the child; the respondent claimed that she was only attempting to visit with her son and give him some presents. The mother testified that her prior attorney advised that it was permissible for her to visit Evan, at any location other than on school grounds. However, the mother did not contact Joan L. to request a visit, or advise the guardian that she was coming to see Evan. Nor did she request her counsel, or the child's attorney, or the Probate Court, for assistance in facilitating a visit. The petitioner did not prove during this proceeding that mother's intention was to kidnap Evan, or otherwise interfere with the Joan L.'s court-ordered guardianship rights. However, the respondent's impetuous and totally misguided actions in attempting to initiate this unannounced contact with Evan (who last saw his mother in August 1994) clearly traumatized the child. School bus driver Kimberly Hurlock testified that she observed Evan get off the bus at the regular stop near his aunt's home. When the child noticed the automobile with an out-of-state license plate in which Marilyn G. and Jim were sitting, he became frightened. He obviously did not know the mother's male companion. Ms. Hurlock said that when CT Page 7498 someone started to get out of the automobile, Evan appeared frightened and began running around in circles. He ran back onto the bus and asked the driver to "please get me out of here." (Testimony of Kimberly Hurlock). The driver subsequently took the child to his aunt. That evening, Jim called the petitioner, in an apparent attempt to explain the mother's actions. The petitioner understandably refused this telephone call.
Evan G. has not physically seen the respondent since the date of the incident at the bus stop. Dr. Coleman testified at trial that as a result of this incident, Evan tries to avoid contact with his mother and has fearful feelings about her. He noted that even before March 1995, the child had "increasingly distant" feelings about Marilyn G.
The respondent left Connecticut shortly after this incident. She went first to Florida with Jim, and then to Illinois. The mother was subsequently hospitalized in Illinois around the time she ended her relationship with Jim. She subsequently relocated to California, where she presently resides. She made several attempts to telephone the child from California, which were rebuffed. She also telephoned DCF in Connecticut after she learned of the termination proceeding, and renewed her complaint that the child had been abused by a member of Joan L.'s home several years earlier. DCF concluded that these allegations were unsubstantiated. The petitioners' summary of facts accompanying the amended petition indicate that the mother made "two or three attempts to call the minor child" since August 1995, and sent him a birthday card by certified mail in September 1995. The mother also sent a message to the child at Thanksgiving that year. The mother did not send a gift or card to Evan during the 1995 holiday season. Joan L. testified that she would have encouraged Evan to speak with his mother if she had telephoned then.
ADJUDICATION (based on facts as of February 28, 1996)
1. Abandonment: C.G.S. § 45a-717 (f)(1) provides that a child is abandoned if his or her parent "has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." Per this statute, the abandonment has to have taken place "over an extended period of time which . . . shall not be less than one year" from the date when the TPR petition was filed or last amended.
The issue of whether or not statutory abandonment has CT Page 7499 occurred depends, in large measure, upon facts related to parental conduct in a particular case. In re Shavoughn K.13 Conn. App. 91 (1987); In re Rayna M., 13 Conn. App. 23 (1987);In Re Michael M. 29 Conn. App. 112 (1992). "Where a parent fails to visit a child, fails to display any love or affection, and no concern for the child's welfare, statutory abandonment has occurred. In re Juvenile Appeal, 183 Conn. 11, 438 A.2d 801
(1981). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of interest, concern or responsibility for the welfare of a child." In re Luke G., 40 Conn. Sup 316, 323, 498 A.2d 1054
(1985).
Sporadic displays of interest or concern for the welfare of a child over a protracted period of time will not overcome a claim of parental abandonment. In re Rayna M., supra, 37-38; In reMigdalia M., 6 Conn. App. 194, 208-209, 210 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986). However, it is also clear that the trier may consider extenuating circumstances which have interfered with a parent's ability to maintain contact with a child when it determines the reasonability of a parent's level of interest and concern. See In re Migdalia, supra, 210.
In the instant case, the mother did not have an automobile and was primarily dependent upon the petitioner to bring the child from Old Lyme to Hamden for visits. She experienced three hospitalizations during 1994, two in Connecticut and one in Florida. Although the mother's testimony concerning the dates and reasons for these hospitalizations was not clear, the court finds that there was a correlation between those periods of in-patient treatment and the times prior to mother's departure for Florida when monthly visitation did not take place. There were several parental visits in 1994, including the time in April 1994 when the grandmother passed away and Evan was left in his mother's care, and the last visit in August 1994. The mother also made telephone calls to the child and wrote him occasionally during 1994.
Around the end of February 1995, while respondent was still in Florida, Joan L. stopped accepting the mother's long-distance phone calls to Evan. The petitioner filed these TPR proceedings on March 20, 1995, two days prior to the mother's ill-conceived attempt to make contact with Evan at the bus stop. As noted above, the mother's actions were insensitive to the best interests of the child, and ultimately very damaging to the CT Page 7500 parent-child relationship. They were indicative of the respondent's poor judgment and impulsivity, and, they clearly upset the child. The mother should have contacted her sister, or at the very least requested assistance from her own counsel, the attorney for the child, or the probate court in arranging a visit with Evan. However, the petitioner's conduct in this regard, while deplorable, is not probative of the claim that she intended to abandon Evan.
Since the incident in March 1995, the respondent sent a birthday card via certified mail to Evan in September 1995, forwarded Thanksgiving greetings and made several other unsuccessful attempts to contact him by telephone. The respondent did not call Evan, or send him gifts, at Christmas of 1995.
The court is mindful that this petition was amended in February 1996, and that the respondent's last contact with Evan was in March of 1995. The court is also aware of the respondent's perplexing behavior, which is undoubtedly related to the problems which necessitated her rather frequent psychiatric hospitalizations. However, the court is also cognizant of the fact that petitioner began refusing the respondent's telephone calls at the end of February 1995, and continued doing so after she filed the TPR petitions several weeks later. The court cannot base a finding of abandonment on lack of contact during a period of time when parental contact was prohibited, or severely limited. The court also notes from a review of the case file that, subsequent to February 1995, neither the respondent nor the petitioner filed any motions with the Probate Court or the Superior Court for Juvenile Matters to enforce, limit, or otherwise modify the stipulated orders of visitation and contact which were entered at the East Lyme Probate Court on April 12, 1993. (The respondent did write to the Probate Court in April 1995, requesting new counsel in this matter.)
Based on respondent's contacts and attempted contacts during 1994 and 1995, and the totality of all the evidence adduced at trial concerning her circumstance during this period, the court does not find abandonment. Specifically, it was not proven, by clear and convincing evidence, that respondent abandoned her child for a period of not less than one year. Accordingly, this count of the petition is dismissed.
2. No ongoing parent child relationship: C.G.S. § 45a-717
(f)(3) defines an ongoing parent child relationship as "the CT Page 7501 relationship which ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of a child." This ground, as applied to non-custodial parents, "must be interpreted in light of the circumstances that actually pertain where children only see such parent during permitted visitation." In re Luke G., supra, 325. See also: In re Jessica M. 217 Conn. 459, 468 (1991). The ultimate standard to be applied by a court in a termination case is whether the child has no present memories or feelings for the parent which are positive in nature. In re Jessica M. supra, 468-469; In re Juvenile Appeal (84-6), 2 Conn. App. 705, 709,483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564
(1985).
In 1992, Dr. Coleman opined that Evan was "strongly and positively" connected to his mother, and that he was conflicted about his loyalties to both the respondent and the petitioner. (Petitioner's Exhibit 13, Page 3). Through 1993, Dr. Coleman was still hopeful that Evan could be returned to his mother's custody, and helped draft a stipulation aimed at reunifying the child with his mother during the 1993-1994 academic year. (Petitioner's Exhibit 12). The court finds that the child, now 12, clearly knows and remembers Marilyn G.
The dispositive question is whether or not any of Evan's feelings or memories concerning Marilyn G. are positive ones. Dr. Coleman testified that the child's bond with his mother is now poor, and that the child has a lot of fearful feelings towards the respondent. He believes that these feelings are a result of the incident at the bus stop in March 1995, but he noted that even before that time Evan had increasingly distant feelings about Marilyn G. Dr. Coleman also testified that since 1992, Evan's feelings were stronger about his guardians, and less positive about his mother. At the present, the child tries to avoid contact with his mother, avoids talking about her, and appears anxious and nervous when he does so. The psychologist opined that Evan regards his aunt and uncle as his psychological parents, and has not talked about returning to live with his mother in recent years.
While the court accepts these observations and opinions, it also finds they do not resolve the pivotal issue of whether or not any positive emotional aspect of his relationship with Marilyn G. survives. (See: In Re Jessica M., supra, 470-471.) Based on the totality of all of the evidence and testimony CT Page 7502 introduced at trial, the court finds that the petitioner has failed to prove by clear and convincing evidence that no ongoing parent-child relationship has existed between Marilyn G. and Evan G. for a period of not less than one year prior to February 1996. Accordingly, the second and remaining count of the petition is also dismissed.
Under Connecticut's termination of parental rights laws, the court may not consider evidence concerning the best interest of the child unless it first finds that one of the statutory grounds for termination has been proven by clear and convincing evidence. "As a matter of statutory fiat, consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination." In reJessica M., supra, 465; In re Barbara J., 215 Conn. 31, 45,547 A.2d 203 (1990); In re Luis C., 210 Conn. 157, 165, 554 A.2d 772
(1989), In re Juvenile Appeal (Anonymous), 177 Conn. 648, 671-672
(1979). In this regard, termination proceedings are dissimilar from custody and visitation hearings, which are decided solely upon best interest considerations.
In dismissing this termination of parental rights petition, the court does not in any way find or suggest that the child has not been properly and lovingly cared for by his guardians. Indeed, all of the dispositional evidence heard by the court during this non-bifurcated proceeding indicated that Joan L. and her family are bonded with Evan, have provided him with a warm and nurturing home for a number of years, and have made sacrifices, and endured personal hardship, in doing so.
The court also notes that the evidence produced at trial, including but not limited to the testimony and demeanor of the respondent, suggests that she has not yet conquered the mental health problems which resulted in her loss of Evan's guardianship.[4] This evidence and testimony also revealed Marilyn G.'s unfortunate tendencies to blame others for problems of her own making, and to lash out at Joan L., who was once her supportive benefactor, by making unfounded accusations. By engaging in unnecessary and unwarranted attacks on the child's guardian, the respondent has damaged her relationship with Evan.
Because of the dismissal of the TPR petition, which the court hereby enters, this matter now reverts by operation of law to the probate court which issued the original removal of guardianship decree. That decree is unaffected by this decision, and remains CT Page 7503 in full force and effect. This court respectfully recommends, in the event that future judicial proceedings are held concerning matters related to Evan's guardianship or visitation, that the reviewing tribunal consider ordering an independent psychiatric and substance abuse evaluation of Marilyn G., and a comprehensive psychological evaluation of the parent-child relationship, in conjunction with any such inquiry.
Dated at Middletown, Connecticut, this 2 day of December, 1996.
BY THE COURT
DYER, J.